|   |   |   |
|---|---|---|
| | **UNITED STATES DISTRICT COURT** | |
| | **DISTRICT OF NEVADA** | |
| Desert Palace, Inc., d/b/a Caesars Palace, a Nevada corporation, | | 2:16-cv-00462-JAD-GWF |
| | Plaintiff | **Order on Motions for Summary Judgment and Plaintiff's Objections to Magistrate Judge's Order** |
| v. | | |
| Andrew P. Michael, et al., | | [ECF Nos. 23, 40, 43, 62, 63] |
| | Defendants | |

On a September evening in 2014, defendant Andrew Michael sat down at plaintiff Caesars Palace's casino to play some blackjack and baccarat.[1] This wasn't an unusual way for Michael to spend an evening: he had been gaming at Caesars for years. He gambled there so frequently, in fact, that the casino allowed him to wager on credit. Michael would sign an agreement promising that he was good for his losses, and Caesars would extend him significant credit to wager at the tables. This evening, Caesars extended Michael $3 million in chips on credit. But lady luck was not with him. By the time the night was over, Michael had wagered and lost it all.

But Michael did something different this visit to Caesars: he refused to sign credit instruments, known as markers, so that Caesars could collect Michael's promised repayment. Michael signed a credit application and a request for the $3 million in credit, but these documents simply required him to endorse the final markers that would obligate him to pay Caesars back.

Caesars sues to compel Michael to sign the markers as his agreement with Caesars requires. And it now moves for summary judgment, arguing that Michael breached his credit agreement and that I should order him to sign the markers so that Caesars can collect on its debt.

Michael opposes primarily by pointing to Nevada's long-time prohibition against enforcing

---

[1] Caesars's business entity is Desert Palace, Inc., d/b/a Caesars Palace. I refer to it as "Caesars" throughout this order.

gaming debts in court. But Caesars is not seeking to enforce a gaming debt yet; it is seeking to enforce Michael's promise to sign credit instruments (so that Caesars can then enforce the debt). Michael agreed to sign credit instruments in the event that he gambled on Caesars's dime, which he did. Those credit instruments would then create an enforceable gaming debt between Caesars and Michael. That Caesars will ultimately enforce those credit instruments to recover on a gaming debt is of no matter. Nevada law prohibits only the enforcement of gaming debts, not the enforcement of an agreement to perfect a credit instrument like Caesars seeks to do.

Michael argues that there is no meaningful difference between enforcing a gaming debt and enforcing an agreement to perfect a credit instrument for a gaming debt. He suggests that allowing casinos to enforce agreements like this will create a loophole for them to shirk the Nevada legislature's bar on gaming-debt enforcement actions. But the Nevada legislature has not barred casinos from enforcing gaming debts—it approves of the practice. Nevada's gaming statutes expressly permit casinos to extend gambling credit to patrons and receive credit instruments after the patron has already gambled away that credit. These statutes contemplate that casinos should get a signed credit instrument from the patron at some point before collecting on the underlying debt, and that is precisely what Caesars is trying to do.

Michael's arguments related to gaming debts fail, as do the host of contractual arguments he raises. I thus deny Michael's motion for summary judgment and grant partial summary judgment in favor of Caesars on Michael's affirmative defenses that challenge this court's subject-matter jurisdiction over this case, and in favor of Caesars on its breach-of-contract claim and request for specific performance.[2]

**Background**

In 2013, Michael signed a written "credit application" in which he agreed that if in future visits he "receive[s] an advance before [he] execute[s] a credit instrument, [he would] promptly []

---

[2] Although Caesars asserts several other claims against Michael, it moves for summary judgment only on its breach-of-contract claim and whether it is entitled to specific performance as a remedy for that claim. ECF No. 63 at 15.

sign a credit instrument in the amount of the advance."[3] He also agreed that Caesars "may litigate any dispute involving the credit line, the debt, or the payee in any court, state or federal, in Nevada."[4] In September 2014, Michael signed another document requesting a credit advance of $3 million.[5]

Over the course of the evening on September 20, 2014, Caesars gave Michael $3 million in chips; Michael gambled away the entire $3 million without first signing any credit instruments.[6] The parties refer to this practice of a casino issuing credit first and getting a signed credit instrument later as "rim credit." Caesars offers evidence that extending rim credit is a common practice in the Nevada gaming industry.[7]

After losing at the tables, Michael did not sign a credit instrument obligating him to pay back the $3 million. When Caesars contacted him, Michael initially replied in an email that he wanted to "re-iterate" that it was "not" his intention to "not sign" the credit instruments, and that he would indeed sign them.[8] But he never did.

Caesars filed this action seeking to compel Michael to sign the credit instruments and pay back the $3 million it advanced. Michael filed an answer and counterclaimed for unjust enrichment, breach of contract, and an accounting. Michael now moves for summary judgment, arguing that I have no jurisdiction over this case because Caesars does not have a signed credit instrument to support Michael's gaming debt.[9] Caesars likewise moves for summary judgment on this same

---

[3] ECF No. 65.

[4] *Id.* At the time he signed this application, a different casino, Harrah's, was named in the application. But Harrah's assigned all rights to the agreement to Caesars. ECF No. 76-3 at 2 (assignment agreement).

[5] ECF No. 67.

[6] ECF No. 63-2.

[7] *Id.* at 3.

[8] ECF No. 69 at 3.

[9] ECF No. 40.

point,[10] and also on its breach-of-contract and specific-performance claims.[11]

With summary judgment motions pending, Michael moved to stay discovery in this case, and the magistrate judge recently granted that motion and stayed discovery.[12] Caesars objects to the magistrate judge's order, arguing that some of the magistrate judge's remarks should not be given any legal effect. The magistrate judge's order simply stayed discovery; it did not purport to affect any of the parties' substantive claims, so I overrule Caesars's objection. The parties also have a pending stipulation to authenticate surveillance videos, which I grant.[13] I now proceed to consider the parties' pending summary-judgment motions.

## Discussion

### A. Summary-judgment standards

The legal standard governing the parties' motions is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."[14] An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party.[15] A fact is "material" if it could affect the outcome of the case.[16]

When considering a motion for summary judgment, I view all facts and draw all inferences in the light most favorable to the nonmoving party.[17] The purpose of summary judgment is "to isolate

---

[10] ECF No. 23.

[11] ECF No. 63. Although specific performance is a remedy for certain contract breaches, Caesars pled it as its fifth claim for relief. *See* ECF No. 1 at 23.

[12] ECF No. 61.

[13] ECF No. 43.

[14] FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing FED. R. CIV. P. 56(c)).

[15] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[16] *Id.* at 248.

[17] *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

and dispose of factually unsupported claims"[18] and to determine whether a case "is so one-sided that one party must prevail as a matter of law."[19] It is not my role to weigh evidence or make credibility determinations.[20] If reasonable minds could differ on material facts, summary judgment is inappropriate.[21]

If the moving party shows that there is no genuine issue as to any material fact, the burden shifts to the nonmoving party, who must "set forth specific facts showing that there is a genuine issue for trial."[22] The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"; it "must produce specific evidence, through affidavits or admissible discovery material, to show that" there is a sufficient evidentiary basis on which a reasonable fact finder could find in its favor.[23]

**B.      Caesars is entitled to summary judgment on its breach-of-contract claim.**

**1.      A casino may generally enforce a patron's agreement to sign a credit instrument in the future.**

The main thrust of the parties' dispute is whether a licensed casino can judicially enforce a contract in which the casino's patron agrees to sign a credit instrument in the future, after he has already gambled on credit. Michael contends that Nevada's common law and gaming statutes bar this sort of action because they prohibit parties from enforcing gaming debts in court. But while Nevada may have once disapproved of casinos allowing players to gamble first and pay later, the Nevada legislature has made clear that is no longer the case.

---

[18] *Celotex Corp.*, 477 U.S. at 323–24.

[19] *Anderson*, 477 U.S. at 252.

[20] *Id.* at 249, 255.

[21] *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

[22] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 323.

[23] *Bank of Am. v. Orr*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991); *Anderson*, 477 U.S. at 248–49.

### i. *Gaming debt enforcement in Nevada*

From the State's founding, Nevada's common law held that any instrument created for "the purpose of reimbursing . . . money knowingly lent . . . for gaming" was unenforceable.[24] In other words, casinos could not enforce an agreement obligating a patron to pay back his gambling losses. So casinos could accept only cash (either at the time of the wager, or in the form of gambling chips); they could not let their patrons gamble on credit.

But then in 1983, the Nevada legislature decided that allowing casino patrons to gamble on credit was in the State's best interest (subject, of course, to careful oversight by Nevada's Gaming Control Board and Gaming Commission). The legislature enacted NRS 463.368, which abrogated the common law rule against gaming debts and allowed casinos[25] to enforce any gaming "credit instrument" and "the debt that the credit instrument represents." This statute expressly allows casinos to accept credit instruments related to gaming debt "either before, at the time[,] or after the patron incurs the debt."[26] And a credit instrument is simply "a writing [that] evidences a gaming debt owed" to a licensed casino.[27] In short, casinos can now enforce gaming debts in court, event if a patron doesn't sign a credit instrument until after he dips well into the red.[28]

### ii. *Caesars is not attempting to enforce a prohibited gaming debt.*

Caesars is attempting to do precisely what the Nevada legislature said it could: extend credit first and get a signed credit instrument later. Michael cites no authority—common law or

---

[24] *Sea Air Support, Inc. v. Herrmann*, 613 P.2d 413, 414 (Nev. 1980); *see also Scott v. Courtney*, 7 Nev. 419 (1872).

[25] The statute allows "licensees" (licensed casinos) to accept credit instruments. Nev. Rev. Stat. § 463.368.

[26] *Id.*

[27] Nev. Rev. Stat. § 463.01467.

[28] *Id.* Indeed, another court in this district recently held that a gambling credit agreement is enforceable in federal court, a decision that was affirmed by the circuit on appeal. *Morales v. Aria Resort & Casino, LLC*, 2:11-cv-02102-LRH-NJK, 995 F. Supp. 2d 1176, 1181 (D. Nev. 2014), aff'd, 646 F. App'x 545 (9th Cir. 2016) ("[B]oth the credit application and the markers are contracts, under which Morales had a duty to pay.").

statutory—suggesting that this sort of action is barred in Nevada.[29] Nevada's common law is of no help because it bars only enforcement of a gaming debt, and the agreement Caesars seeks to enforce is not a debt at all. It merely obligates Michael to sign a credit instrument—which will then create an enforceable gaming debt between him and Caesars.[30] Michael offers no authority or explanation suggesting that an agreement to sign a credit instrument in the future is not enforceable under Nevada's common law.

Nor does Nevada's gaming statutory scheme help him. Michael relies on NRS 463.361 and cases interpreting this statute to argue that any action amounting to a gaming debt collection effort is statutorily barred in Nevada. He points to language stating that "gaming debts that are not evidenced by a credit instrument are void . . . and do not give rise to any administrative or civil cause of action." Michael reads this statute to mean that if a casino extends credit to a patron without first getting him to sign a credit instrument, the patron's gaming debt is forever unenforceable.

But the statute Michael relies on does not even apply to licensed casinos—it governs collection actions brought by patrons. NRS 463.36*1* is for "recovery of gaming debts by *patrons.*" "Recovery of gaming debts by *licensees*" like Caesars is governed by a different statute: NRS 463.36*8*. Similarly, all of Michael's authority addresses patrons seeking to enforce gaming debts (most commonly, patrons claiming that a casino owes them gambling winnings), not casinos seeking to enforce them.[31]

---

[29] Indeed, in the credit application he signed, Michael agreed that Caesars "may litigate any dispute involving the credit line, the debt or the payee in any court, state or federal, in Nevada. I submit to the jurisdiction of any court, state or federal, in the state of Nevada." ECF No. 65 at 2.

[30] Nevada law has long recognized that a casino can collect on a marker, not unlike a check. *See Nguyen v. State*, 14 P. 3d 515, 516–17 (Nev. 2000) (explaining how a marker works); *see also Morales*, 995 F. Supp. 2d at 1180–81 (noting that markers are enforceable credit instruments under Nev. Rev. Stat. § 463.368(1)).

[31] *Zoggolis v. Wynn Las Vegas, LLC*, 768 F.3d 919 (9th Cir. 2014) (patron suing casino for failing to limit his credit line); *Erickson v. Desert Palace, Inc.*, 942 F.2d 694, 695 (9th Cir. 1991); *Devon v. Unbelievable, Inc.*, 820 F. Supp. 528, (D. Nev. 1993); *Sengel v. IGT*, 2 P.3d 258, 260 (Nev. 2000) (patron suing for slot machine malfunction). In his briefing, Michael represents that these cases hold that gaming debts "unsupported by negotiable instruments are—for gaming licensees—without remedy." ECF No. 75 at 10. This is false. None of these cases addressed whether or when a gaming

1       Second, even if Caesars were subject to NRS 463.361, nothing in this section (or in any of
2  Nevada's gaming statutes) suggests that casinos are barred from issuing gaming credit first and
3  asking for a credit instrument later. Much the opposite: NRS 463.368 expressly allows casinos to
4  accept credit instruments "after the patron incurs the debt." The statute thus contemplates that
5  casinos will accept credit instruments after a patron has already lost money gambling. Adopting
6  Michael's interpretation that casinos may accept credit instruments only at the time that a player
7  loses would make this portion of the statute meaningless,[32] and Nevada's canons of statutory
8  construction discourage that result.[33]

9       Finally, NRS 463.361 applies only to "gaming debt," and as I explained above, Caesars seeks
10 by this action to enforce something different (an agreement to perfect a credit instrument). As the
11 Nevada Supreme Court has explained, the statute's prohibition on enforcing gaming debts applies
12 when one person takes on debt to wager against another, not to other transactions (like an agreement
13 to sign a credit instrument).[34]

14      Michael suggests that the legislature meant to bar casinos from bringing any judicial action
15 related to gaming debts without first obtaining a signed credit agreement, but he fails to offer any
16 persuasive analysis or statutory language to support his position. No authority suggests that the

---

debt is valid for gaming licensees—these cases all expressly addressed unlicensed patrons. Indeed, every case that Michael relies on deals with patron claims against a casino. *See Nelson v. MGM Grand Hotel, LLC*, 287 F. App'x 587, 589 (9th Cir. 2008).

[32] Michael contends that allowing actions to enforce agreements to perfect credit instruments would "create a goat path around the well-guarded statutory gates that block Caesar's path." ECF No. 75 at 10. Far from "well-guarded," the Nevada legislature threw wide the gates for casinos like Caesars. It abrogated the prohibition against gaming credit instruments and gave casinos the flexibility to accept these instruments for gaming debts even after a patron has already incurred gambling on the casino's credit.

[33] *See, e.g., Leven v. Frey*, 168 P. 3d 712, 717 (Nev. 2007) (noting that Nevada's rules of statutory interpretation prohibit a construction that would render a provision "meaningless, and thus produce an unreasonable result").

[34] *Sigel v. McEvoy*, 707 P.2d 1145, 1146 (Nev. 1985) (holding that agreement was not considered a gaming debt because, although the agreement involved gambling, it did not create a debt for purposes of wagering against the other).

common law or statutory prohibitions on enforcing gaming debts should also apply to enforcing an agreement to sign a credit instrument. If anything, the Nevada legislature has signaled that it approves of this practice. And the Nevada Gaming Commission's regulations specifically refer to "rim credit," so the Commission obviously recognizes this practice, too.[35]

To sum up, nothing in Nevada's common law or its gaming statutes suggests that a licensed casino is precluded from enforcing an agreement in which a patron agrees to sign a credit instrument in the future, regardless of whether that instrument involves a gaming debt. Michael's primary argument in this case therefore has no merit.[36]

### 2. There remain no triable issues of fact as to whether Caesars can enforce its credit agreement against Michael.

Michael contends that even if Nevada's gaming-debt rules do not bar Caesars's claim, the credit agreement is nevertheless unenforceable. He argues that (1) Caesars is not the real party in interest to the credit agreement, (2) there are not enough definite terms for the credit agreement to have a valid offer and acceptance, (3) Caesars did not assent to the agreement, and (4) Michael did not have capacity to assent because he was intoxicated on the night he signed it. These arguments have no merit.

Michael argues that Caesars has no standing to enforce the credit agreement because the agreement was between him and Harrah's Entertainment, Inc., not Caesars. Michael waived this argument by not raising it as an affirmative defense in his answer.[37] But even if he had, the undisputed evidence shows that Caesars was assigned all rights to the credit agreement, so it has

---

[35] *See, e.g.,* Nev. Gaming Comm. Reg. 6.040(2); Nev. Gaming Comm. Reg. 6.010(11) (discussing accounting rules for "credit instruments *or rim credit*") (emphasis added).

[36] Although not addressed by the parties, Caesars appears to have a binding credit instrument to enforce in this case. NRS 463.01467 defines a "credit instrument" as a simple writing that evidences a debt owed to a licenced casino. Michael's written credit application in which he agreed to sign credit instruments, in conjunction with Caesars's extension of credit, would appear to qualify as a credit instrument for purposes of Nevada's gaming statutes.

[37] ECF No. 5; *see also Hassanati v. Int'l Lease Fin. Corp.*, 51 F. Supp. 3d 887, 908 n.55 (C.D. Cal. 2014) (citing *United States ex rel. Reed v. Callahan*, 884 F.2d 1180, 1183 n.4 (9th Cir. 1989) (discussing that defenses must be affirmatively pleaded).

standing to enforce it.[38]

Michael next argues that the credit agreement is merely an "agreement to agree" in the future and did not contain the requisite term of how much credit Caesars would extend him. But the parties did not merely "agree to agree" in the future; they exchanged mutual promises at the time. Michael agreed to sign credit instruments in the future and Caesars agreed to extend $3 million in credit to Michael. Although this $3 million figure was not written into the initial credit application, it was written into the second written credit request that Michael signed. And the parties' objective manifestations make clear that they agreed on this sum—after all, Caesars extended the credit.

Nor am I persuaded that Caesars did not intend to be bound by the parties' agreement because it took on no obligations and never signed anything in writing. Whether a party signs an agreement is "immaterial" if it "accepts it" and relies on that agreement.[39] And Caesars objectively manifested its assent and reliance by extending Michael $3 million in credit.[40]

Michael also contends that Caesars cannot seek to have him specifically perform by signing the credit agreement, but it can. Specific performance is appropriate when: (1) the terms of the contract are definite and certain; (2) the remedy at law is inadequate; (3) the party seeking to enforce the agreement has performed; and (4) the court is willing to order it.[41] All of these factors are met

---

[38] ECF No. 76-3 at 2 (assignment agreement); *Camino Properties, LLC v. Ins. Co. of the W.*, 2016 WL 1213224, at *4 (D. Nev. Mar. 23, 2016) ("In general, contracts are freely assignable in the absence of language to the contrary.").

[39] *J. A. Jones Constr. Co. v. Plumbers & Pipefitters*, 568 F.2d 1292, 1295 (9th Cir. 1978).

[40] Michael also mentions that Caesars had an obligation to present the credit instrument to him in a "timely" manner, but he offers no persuasive reason that this is so. There is no evidence suggesting that Caesars promised to present the instrument at any specific time. And even if Caesars breached some minor duty related to how quickly it needed to present the markers, "no reasonable jury could find such a breach was so material that it absolved [him] of his obligation to pay." *Morales*, 646 F. App'x at 546 (holding in an unpublished decision that a patron who breached a gambling credit agreement was not relieved of his duty to pay merely because the casino might have committed some minor breaches).

[41] *Serpa v. Darling*, 810 P.2d 778, 782 (Nev. 1991); *Sheehan & Sheehan v. Nelson Malley & Co.*, 117 P.3d 219, 223 (Nev. 2005); *Ray Motor Lodge v. Shatz*, 390 P.2d 42, 44 (Nev. 1964) (specific performance ordered to sign escrow instructions).

here. The terms of the parties' agreement are clear: Michael agreed to sign credit instruments if he accepted credit from Caesars. The record is unequivocal in the fact that Caesars provided—and Michael accepted—the $3 million in credit. Caesars's remedy at law (damages) is inadequate because Caesars requires the promised markers to process them like checks.

Finally, Michael has not raised a triable issue for his capacity defense. He suggests that there is a triable issue of fact as to whether he was too intoxicated at the time to properly assent to the credit agreement. But the only evidence that Michael offers on this point is a single line in an affidavit filed earlier in this case, in which he says that he drank "heavily" and was "intoxicated" the night that he gambled the $3 million. Not only did Michael fail to properly present this evidence with his opposition, his bare averment that he drank copious amounts of alcohol is not enough to create a triable issue about his capacity.[42]

There remain no triable issues of fact as to Caesars's claim for breach of contract and its request for specific performance of that contract. I therefore grant Caesars's motion for summary judgment on its breach of contract claim and request for specific performance. I direct Michael to execute the credit instrument in the amount of $3,000,000, which represents the Outstanding Rim Debt that Caesars issued to him on September 20–21, 2014, as requested in paragraph 77 of the complaint.[43]

**C.    The parties' cross-motions for summary judgment on jurisdiction**

The parties both move for summary judgment on the question of whether this court has jurisdiction to hear this matter. Michael contends that the Nevada Gaming Control Board has

---

[42] Michael even acknowledges that he "will need" "Expert testimony concerning intoxication and capacity." ECF No. 75 at 14. And he asks that I defer ruling on or deny Caesars's motion for summary judgment until he can conduct further discovery on his capacity defense. But Michael does not even attempt to comply with the requirements of Federal Rule of Civil Procedure 56(d) to obtain this relief. He offers no affidavit or declaration as required by this rule, nor does he explain with specificity what outstanding discovery he would conduct and what it would yield. *See* Fed. R. Civ. P. 56(d). I therefore deny his request. *See, e.g., Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1169 (9th Cir. 2011) (failure to comply with requirements of FRCP 56(d) is a proper ground for denying relief).

[43] ECF No. 1 at 23, ¶ 77.

exclusive jurisdiction over any attempt to collect a gaming debt unsupported by a credit instrument—and that Caesars brings this case to do just that: collect a gaming debt from Michael without a credit instrument. But as I explained above, Caesars brought this action to perfect a credit instrument, not merely to enforce a gaming debt. And, in any event, the Gaming Board's administrative process for unpaid debts is only for patrons, not licensed casinos.[44] The Gaming Board agrees: Caesars already asked the Board to handle this case, and it refused—a fact Michael concedes in his later briefing.[45] I thus grant Caesars's motion for summary judgment on Michael's affirmative defenses 20 and 36–39, predicated on the argument that jurisdiction over this case rests exclusively with the Nevada Gaming Control Board (ECF No. 23), and I deny Michael's countermotion on the same point (ECF No. 40).

**Conclusion**

Accordingly, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the plaintiff's **motion for partial summary judgment [ECF No. 23] is GRANTED.**

IT IS FURTHER ORDERED that the defendant's **motion for partial summary judgment [ECF No. 40] is DENIED.**

IT IS FURTHER ORDERED that the plaintiff's **motion for partial summary judgment [ECF No. 63] is GRANTED. Defendant Andrew P. Michael is ordered to specifically perform his promise by promptly executing in full a credit instrument in the amount of $3,000,000, which represents the outstanding rim debt that Caesars issued to him on September 20–21, 2014.**

IT IS FURTHER ORDERED that the parties' stipulation to authenticate evidence **[ECF No. 43] is GRANTED.**

IT IS FURTHER ORDERED that the plaintiff's **objection [ECF No. 62] is OVERRULED.**

. . .

---

[44] Nev. Rev. Stat. § 463.361.

[45] ECF No. 39 at 11.

IT IS FURTHER ORDERED that this matter is **referred to a magistrate judge for a mandatory settlement conference** to resolve any remaining claims and issues.

Dated this 22nd day of June, 2017.

_____
Jennifer A. Dorsey
United States District Judge