# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| Desert Palace, Inc., d/b/a Caesars Palace, | Case No.: 2:16-cv-00462-JAD-GWF |
| Plaintiff | **Order Granting Plaintiff's Motions for Summary Judgment and Holding Defendant in Contempt of Court** |
| v. | |
| Andrew P. Michael, | [ECF Nos. 163, 169–70] |
| Defendant | |

Defendant Andrew P. Michael, a British citizen residing in England,[1] was a regular gambler at Caesars Palace[2] in Las Vegas. He visited so frequently that Caesars allowed him to wager on credit. Michael signed a credit application promising to execute a subsequent credit instrument (also known as a marker) before, or promptly after, Caesars extended him a line of credit so that Caesars could collect the debt. In September 2014, Caesars extended $3 million in credit to Michael, but he didn't sign the marker. Instead, he gambled and lost it all, went home, and left Caesars without an instrument to collect its debt. And although Michael later told Caesars he never intended to leave without signing—blaming the casino for not presenting him with the marker the night of his play—he resisted Caesars's subsequent attempts to obtain his signature.

Caesars sues to compel Michael to sign the marker in order to seek damages for the unpaid debt that the marker represents. It also sues Michael for fraud, alleging that he took out credit he had no ability or intention of repaying and is therefore liable for punitive damages. I granted Caesars partial summary judgment on its specific-performance claim, finding that

---

[1] ECF No. 5 at 16.

[2] Caesars's business entity is Desert Palace, Inc., d/b/a Caesars Palace. The parties and I have referred to it as "Caesars" throughout this case.

Michael breached the credit-application contract and ordering him to execute the marker.[3]  But Michael refuses to comply, contending that I improperly granted Caesars summary judgment and that signing the marker would expose him to criminal prosecution under Nevada law.[4] Compounding his intransigence, Michael refused to participate in discovery.  So, I sanctioned Michael by deeming established the facts necessary to prove Caesars's fraud claim against him.[5]

Caesars now moves for summary judgment on its contract claim, arguing that I should, in equity, award it damages in the amount of Michael's loan and contractual interest, minus an offset for over $582,000 in unrelated funds that it has on hold for him.[6]  Caesars also separately seeks summary judgment on its fraud claim.[7]  Because Michael, by refusing to comply with my order to sign the marker, has rendered specific performance an inadequate remedy, and because Caesars only needs the marker signed to sue Michael for the underlying debt, I find that directly awarding damages to Caesars is appropriate and that Michael is equitably estopped from challenging Caesars's ability to sue him without a signed marker.  But because Caesars seeks summary judgment on Michael's counterclaim for the $582,000 it has on hold, and it has not sufficiently briefed this issue, I deny, for now, Caesars's claim to these funds but grant it leave to renew its motion.  I also grant Caesars summary judgment on its fraud claim because the factual findings that resulted from my sanctions order establish all the elements of that claim.  But because Caesars has not yet addressed what punitive damages it seeks, I also grant it leave to address this issue in its subsequent brief.  Finally, I hold Michael in contempt of court for

---

[3] ECF No. 77.

[4] ECF No. 91 (response to order to show cause why Michael should not be held in contempt).

[5] ECF No. 174.

[6] ECF No. 169 (partial summary-judgment motion on contract claim).

[7] ECF No. 170 (partial summary-judgment motion on fraud claim).

refusing to comply with my order to sign the marker and direct Caesars to address what penalty is appropriate.

## Background

**A.    Michael signs a credit agreement with Caesars, gambles away $3 million in borrowed money, and refuses to sign the marker for this loan.**

In late 2013, Michael entered into a written agreement with Caesars setting out terms for any future credit that it extended him to gamble in its casino, including the process for signing credit instruments—i.e., markers.[8]  A signed marker is effectively a check because it includes the patron's bank-account information and authorizes the casino to draw on that account for whatever portion of the loaned money he loses.[9]  Under the terms of the "credit application," Michael agreed to sign any future markers *before* drawing money from his credit line.[10]  But in the event that he received the advanced funds first, Michael agreed to then "promptly . . . sign a [marker] in the amount of the advance."[11]  This type of play-first, sign-later arrangement is referred to as "rim credit."  In mid-September 2014, Michael signed another document requesting that Caesars increase his credit line to $3 million.[12]

Over a week later, Michael drew on the credit line, taking out the full $3 million in chips to gamble with, but without first signing a marker.[13]  Michael lost the entire amount, left the

---

[8] ECF No. 65 (credit application).  At the time that Michael signed this application, a different casino, Harrah's, was named in the application.  But Harrah's assigned all rights to the agreement to Caesars.  ECF No. 76-3 at 2 (assignment agreement).

[9] *Nguyen v. State*, 14 P.3d 515, 516–17 (Nev. 2000).

[10] ECF No. 65.

[11] *Id.*

[12] ECF No. 67 (credit-limit-increase report).

[13] ECF No. 63-2; ECF No. 66 (unsigned $3 million marker).

casino, and returned to England. After Caesars contacted Michael the following day, he emailed

its representative, "re-iterat[ing] it was not [his] intention to not sign" the marker.[14] Caesars

attempted over the next few days to facilitate his payment of the outstanding debt by providing

Michael (at his request) information for wiring the funds and even offering him a sizable

discount on the loss if he would return to Las Vegas to sign the marker.[15] Michael never pursued

either avenue.

**B.    Caesars sues to compel Michael to sign the marker, and I order him to do so.**

Caesars filed this suit in early 2016, alleging, among other things, that Michael breached

the credit application by failing to sign the marker, and requesting specific performance in the

form of a court order directing Michael to sign.[16] Michael counterclaimed for breach of contract,

alleging that Caesars was withholding more than $582,000 in funds from non-descript "prior

transitions" between the two parties.[17]

Both parties eventually moved for summary judgment on Caesars's contract claim.

Michael primarily argued that, without a signed marker, Caesars couldn't sue him to recover the

loan. In support, he relied exclusively on NRS 463.361, which states that "gaming debts that are

not evidenced by a credit instrument are void and unenforceable and do not give rise to any

administrative or civil cause of action." Michael's reading of the statute effectively meant that,

if a casino extends credit to a patron without *first* getting him to sign a marker, that patron's debt

---

[14] ECF No. 69 at 3 (emails between Michael and Caesars).

[15] *Id*. at 2–3.

[16] ECF No. 1-1 at 18–19 (contract claim requesting specific performance), 23 (separate specific-performance claim).

[17] ECF No. 5 at 16.

is forever unenforceable.[18]  But that statute, I determined, governed the process for *patrons* recovering gaming debts from casinos.  Another statute, NRS 463.368, addresses the inverse situation presented in this case—a patron indebted to a casino—and expressly allows casinos to (1) receive a signed marker *after* extending credit and (2) enforce "the debt that the [marker] represents" through "legal process."[19]  Although Michael reads this statutory scheme to effectively require casinos to have a signed marker on hand as a condition precedent to initiating a suit in *any way related* to enforcing a gaming debt, he failed (and has yet) to cite any case or statutory authority supporting this expansive interpretation.[20]  Caesars initiated suit not to directly recover damages on an unsigned marker, but to first compel Michael, under the terms of his credit application, to sign his marker so that Caesars could then seek to collect on the underlying debt.[21]  And because Caesars needs the signed marker to ultimately recover against Michael, a remedy at law was inadequate.  I therefore found that the equitable remedy of specific performance was appropriate, granted Caesars partial summary judgment on its contract claim, and directed Michael to execute the marker for the $3 million loan to him.[22]

## C.  Michael refuses to sign the marker, prematurely appeals, and is ordered to show cause why he shouldn't be held in civil contempt of court.

Weeks went by and Michael neither signed the marker nor sought any kind of relief from the court.  He instead filed a notice of appeal from my partial-summary-judgment decision, even

---

[18] ECF No. 77 at 7 (order on parties' motions for partial summary judgment).

[19] Nev. Rev. Stat. § 463.368(1), (3)(b); ECF No. 77 at 6–7.

[20] ECF No. 77 at 7–8.

[21] *Id*.

[22] *Id*. at 11.

though it was not a final order and judgment had not been entered.[23]  Caesars then moved for an order to show cause why Michael should not be held in contempt of court.[24]  Before I could act on the motion, the Ninth Circuit dismissed Michael's appeal as premature.[25]  Undeterred, he petitioned the Ninth Circuit for a writ of mandamus, which was also eventually denied.[26]  By that point, eight months had passed since I had directed Michael to sign the marker, and he still had not complied with my order.  I therefore directed him to show cause why he shouldn't be sanctioned or held in civil contempt.[27]

In response, Michael questioned the "legitimacy of the underlying order," effectively asserting that, because he disagreed with my summary-judgement analysis, he should not be compelled to sign the marker or be held in contempt.[28]  He embedded in that argument a request to certify to the Nevada Supreme Court the question of whether a casino, in the absence of a signed marker, can seek to compel a patron to sign that very instrument.[29]  Michael also represented that his financial situation has drastically changed in the years since he lost Caesars's $3 million and that he consequently can no longer cover this debt.[30]  He therefore asserted that, if he signed the marker, he could be prosecuted in Nevada for violating the state's bad-check statute, a Category D felony.[31]  I have yet to rule on this order to show cause.

---

[23] ECF No. 83.

[24] ECF No. 84.

[25] ECF No. 128.

[26] ECF Nos. 131, 162.

[27] ECF No. 163.

[28] ECF No. 164 at 5–9.

[29] *Id*. at 8.

[30] *Id*. at 3–4.

[31] *Id*. at 9–10; *Nguyen*, 14 P.3d at 518 ("[W]e conclude that the markers at issue in the instant case fall within the purview of the bad check statute.").

**D.      Michael is sanctioned for refusing to participate in discovery and Caesars moves for summary judgment on its contract and fraud claims.**

Shortly before the Ninth Circuit dismissed Michael's appeal, Caesars moved for discovery sanctions because Michael failed to appear at his first deposition and, even after Magistrate Judge Foley denied him a protective order, he still failed to appear at his second deposition.[32]  Finding that "Michael ha[d] consistently failed to abide by Court orders and participate in discovery," Judge Foley ordered him to pay monetary sanctions.[33]  Judge Foley also recommended that I deem established the facts related to Caesars's fraud claim—the issue it principally sought to depose Michael about.[34]  Michael objected to this report and recommendation.[35]

While my decision on this recommendation was pending, Caesars filed two separate motions for summary judgment on its contract and fraud claims because the dispositive-motions deadline was looming.[36]  Michael responded only to the fraud claim.[37]  Before that motion was fully briefed, I issued an order accepting and adopting Judge Foley's report and recommendation on the claim-dispositive sanctions.[38]  As discussed in more detail below, I therefore deemed several facts related to Caesars's fraud claim established, including its central contention that, "[d]espite the knowledge that he did not have sufficient funds to satisfy a $3 million credit

---

[32] ECF No. 174 at 2.

[33] *Id*. at 2 (quoting ECF No. 148 at 4).

[34] *Id*.

[35] ECF No. 152.

[36] ECF No. 170 at 3.

[37] ECF No. 171; *see also* ECF No. 172.

[38] ECF No. 174.

obligation, Michael induced Caesars to act by advancing him credit up to and including the sum of $3 million based upon his history of gambling with Caesars and the express provisions of the credit application."[39]  Because these findings directly related to Caesars's motion for partial summary judgment on its fraud claim, I gave Michael the opportunity to file a supplemental opposition, which he did.[40]  I now turn to Caesars's summary-judgment motions and my order to show cause.

## Legal standard

Summary judgment is appropriate when the pleadings and admissible evidence "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[41]  When considering summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.[42]  If reasonable minds could differ on material facts, summary judgment is inappropriate because its purpose is to avoid unnecessary trials when the facts are undisputed, and the case must then proceed to the trier of fact.[43]

If the moving party satisfies Rule 56 by demonstrating the absence of any genuine issue of material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts showing that there is a genuine issue for trial."[44]  "To defeat summary judgment, the

---

[39] *Id*. at 9.

[40] *Id*.; ECF No. 175.

[41] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)).

[42] *Kaiser Cement Corp. v. Fishbach & Moore, Inc*., 793 F.2d 1100, 1103 (9th Cir. 1986).

[43] *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

[44] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323.

nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy its burden at trial."[45]

## Discussion

### I. Caesars's summary-judgment motion on its contract and equitable-estoppel claims and set-off/recoupment affirmative defenses

Because Michael has refused to comply with my order and sign the marker, Caesars is unable to pursue standard debt-enforcement mechanisms, such as using the marker as a negotiable instrument to withdraw the funds directly from his bank account[46] or suing Michael for the underlying debt.[47] In other words, Caesars has no remedy at law. It therefore seeks two alternative equitable remedies. It first argues that, because Michael's noncompliance has rendered the remedy of specific performance inadequate, I may, in equity, award it damages to obtain complete relief. Second, Caesars contends that Michael should be equitably estopped from arguing that his gaming debt is unenforceable without a signed credit instrument when his own wrongful conduct is the only reason the marker remains unsigned. Caesars also seeks

---

[45] *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. Dec. 26, 2018).

[46] *Nguyen*, 14 P.3d at 516 ("The marker is an instrument, usually dated, bearing the following information: the name of the player; the name, location, and account number of the player's bank; and the instruction 'Pay to the Order of' the casino for a specific value in United States dollars."); *id.* ("When a patron has concluded play, he either pays the full amount of the marker he has obtained or leaves the casino with the marker outstanding. If the marker remains outstanding, casino personnel attempt to notify the patron and, after a specified period of time, submit the marker to the patron's bank for collection.").

[47] *See Morales v. Aria Resort & Casino, LLC*, 995 F. Supp. 2d 1176, 1181 (D. Nev. 2014) ("Indeed, markers are merely instruments for collecting on a gambling debt, as distinct from the debt itself, and redeeming a marker is not the only means by which a gaming establishment may seek to collect on an outstanding debt."), *aff'd*, 646 F. App'x 545 (9th Cir. 2016); *see also, e.g.*, *LaBarbera v. Wynn Las Vegas, LLC*, 422 P.3d 138, 139 (Nev. 2018) (casino suing patron to collect on an unpaid signed marker); *Wynn Las Vegas, LLC v. Tofani*, No. 69936, 2017 WL 6541827, at *1 (Nev. App. Dec. 14, 2017) (same).

summary judgment on Michael's counterclaim for the $582,000 it has on hold for him, arguing

that it can equitably recoup these funds in order to satisfy his debt.  Michael did not file an

opposition to Caesars's motion on these issues, but because a district court may not grant

summary judgment based only on the non-moving party's failure to oppose,[48] I address each

issue in turn.

### A. Because Michael, by refusing to sign the marker, has rendered specific performance an inadequate remedy, I may award damages to Caesars.

Although damages are traditionally considered a remedy at law, a court acting in equity

may nonetheless "award damages in lieu of the desired equitable remedy" when "the granting of

equitable relief appears to be impossible or impracticable . . . ."[49]  As New York's high court has

explained:

> It is a familiar principle that a court of equity, having obtained
> jurisdiction [over] the parties and the subject-matter of the action,
> will adapt its relief to the exigencies of the case.  It may order a
> sum of money to be paid to the plaintiff, and give him a personal
> judgment therefor, when that form of relief becomes necessary in
> order to prevent a failure of justice, and when it is for any reason
> impracticable to grant the specific relief demanded.[50]

---

[48] *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 949 (9th Cir. 1993); Local Rule 7-2(d) ("The failure of an opposing party to file points and authorities in response to any motion, except a motion under Fed. R. Civ. P. 56 or a motion for attorney's fees, constitutes a consent to the granting of the motion.").

[49] *Doyle v. Allstate Ins. Co.*, 136 N.E.2d 484, 486 (N.Y. 1956).

[50] *Id.*; *see also County of La Paz v. Yakima Compost Co.*, 233 P.3d 1169, 1189 (Ariz. Ct. App. 2010) ("The court may award equitable damages when specific performance does not afford complete relief."); *King Aircraft Sales, Inc. v. Lane*, 846 P.2d 550, 555–56 (Wash. Ct. App. 1993) ("If the defendant has by his own act incapacitated himself from performance, the court of equity may, instead of dismissing the plaintiff's suit for specific performance, award him the legal remedy of damages." (internal quotation marks, citations, and brackets omitted)).

To award equitable damages, courts first typically determine that a traditional equitable remedy, like specific performance, is appropriate because damages are presumed insufficient as a matter of law—such as for breach-of-contract actions regarding the purchase of real property or for rare goods.[51]  But once specific performance proves to be impossible because, for instance, the defendant is unwilling or unable to comply, courts have then resorted to awarding damages.[52]

Because Caesars needed a signed marker to seek damages against Michael, specific performance was the appropriate remedy here.  Indeed, in granting Caesars summary-judgment on its contract/specific-performance claim, I distinguished between an action to obtain damages without a signed credit instrument—which Nevada law proscribes—and an action to compel a patron to sign a marker based on an independent contractual obligation.  But Michael has refused to comply with both his obligation under his credit application to sign the marker after receiving rim credit and my order enforcing that contract.  His obstinance has thus made it impossible for

---

[51] *See, e.g.*, *Fazzio v. Mason*, 249 P.3d 390, 392 (Idaho 2011) ("The district court . . . ordered specific performance under the breach of contract claim, finding that there was good reason to enforce the contract by specific performance rather than by the legal remedy of contract damages" because the real property at issue was "unique" and had been "materially altered" by defendant); *King Aircraft Sales*, 846 P.2d at 553 (finding that specific performance was initially the appropriate remedy in a contract action for the purchase of two planes based on the trial court's finding that "the planes were so rare in terms of their exceptional condition that [the plaintiff] had no prospect to cover its anticipated re-sales by purchasing alternative planes, because there was no possibility of finding similar or better planes").

[52] *E.g.*, *Fazzio*, 249 P.3d at 397 ("After [the defendant] failed to comply with the award of specific performance [by not closing on the parcels of real property he contracted to purchase], the district court entered a judgment against [the defendant] for the contract prices plus interest, which put the [plaintiffs] precisely in the position they would have been in but for [the] breach."); *King Aircraft Sales*, 846 P.2d at 556 ("[The defendant], by its own act of selling the planes, incapacitated itself from performance.  Under these circumstances, the court of equity did not err in finding that 'other proper circumstances' were present for issuance of relief under a claim of specific performance under the UCC.  The trial court had the discretion to award the legal remedy of damages or other relief deemed just by the trial court.").

Caesars to obtain relief through specific performance.  Because it would be unjust under these circumstances to allow Michael to prevent Caesars from obtaining damages, equity allows me to craft an alternative remedy that would afford Caesars complete relief.  And Michael's refusal to comply with court orders at every stage of this litigation demonstrates that the only effective remedy is to award Caesars the damages it ultimately seeks.  I therefore grant it summary judgment on the damages portion of its breach-of-contract claim.  But before addressing the measure of those damages, I first consider the remainder of his summary-judgment motion.

### B.  Michael is equitably estopped from arguing that his gaming debt is unenforceable without an executed credit instrument.

Although the principle of equitable damages discussed above is alone sufficient to grant Caesars the relief it seeks, I also address its alternative argument,[53] equitable estoppel, which Caesars has also asserted as a claim for relief.[54]  This doctrine "functions to prevent the assertion of legal rights that in equity and good conscience should not be available due to a party's conduct.  Thus, when a party acts in bad faith and with an intent to defraud, it can be estopped from challenging the enforceability of a contract executed because of that conduct."[55]

For instance, in *Topaz Mutual Co. v. Marsh*, the Nevada Supreme Court found the doctrine applicable to a contract that would have otherwise been unenforceable under state law.  Marsh loaned money to a privately owned public utility, a transaction that, under Nevada law,

---

[53] *See United States v. Carona*, 660 F.3d 360, 369 (9th Cir. 2011) ("The term 'belt and suspenders' is sometimes used to describe the common tendency of lawyers to use redundant terms to make sure that every possibility is covered.  That some wear a belt and suspenders does not prove the inadequacy of either to hold up the pants, but only the cautious nature of the person wearing the pants." (internal quotation marks and citation omitted)).

[54] ECF No. 1 at 24–25.

[55] *Topaz Mut. Co. v. Marsh*, 839 P.2d 606, 611 (Nev. 1992); *see also Mahban v. MGM Grand Hotels, Inc.*, 691 P.2d 421, 423 (Nev. 1984) (describing the doctrine as four elements).

requires approval from the Public Service Commission (PSC).[56]  Because the PSC had not

approved the full amount that Marsh ultimately lent, the public utility, Topaz, argued that the

loan contract was void.[57]  Although the court agreed that the lack of PSC approval rendered the

contract at least voidable, it held that Topaz was equitably estopped from arguing that the

contract was unenforceable because Topaz had falsely "represented to Marsh that approval had

been secured and that it was appropriate to make the loan in the full amount."[58]  The court

reasoned that, "[t]o enforce the contract only to the limit of the PSC approval would allow Topaz

to escape full responsibility for its misrepresentations and would penalize Marsh, who loaned the

full sum requested in good faith . . . ."[59]  Courts in other states have similarly applied equitable

estoppel in cases where the lack of a signed contract would have voided the parties' agreement

under state law but the defendant's conduct prevented the written contract from being created or

fully executed.[60]

---

[56] *Topaz Mut. Co.*, 839 P.2d at 608, 610–11.

[57] *Id*. at 610–11.

[58] *Id*. at 611.

[59] *Id*. ("If we permit [the defendant] to claim that the loan, which was consummated by fraudulent acts of its officers and directors, is unenforceable [under] NRS 704.325, we will be permitting the utility to profit from its own wrongful conduct.  This we will not do.").

[60] *E.g.*, *Tarver v. Ocoee Land Holdings*, LLC, No. E2010-01759-COA-R3-CV, 2011 WL 12701893, at *7 (Tenn. Ct. App. Sept. 19, 2011) (finding that a defendant was equitably estopped from arguing that a contract to buy land from a married couple was unenforceable because only the husband had signed the contract, given that it was the defendant's "real estate agent who gave [the husband] false and misleading information that [his wife's] signature was not required on the document"); *Joe D'Egidio Landscaping, Inc. v. Apicella*, 766 A.2d 1164, 1167 (N.J. Super. App. Div. 2001) (applying equitable estoppel and holding that an oral contract for the plaintiff to perform home-improvement work for the defendant was not void under a state consumer-protection statute requiring such contracts to be in writing because the defendant had "insisted a written contract was unnecessary in light of their long-standing relationship").

Here, even though the lack of Michael's signature on the marker would render the underlying debt unenforceable under Nevada law, there are multiple reasons why he is equitably estopped from raising enforceability as a defense. First, as a result of my sanctions order, it is established that Michael "induced" Caesars into extending him $3 million in credit, but he had "no intention" of signing the marker or "repay[ing] the advance . . . ."[61] Therefore, allowing Michael to declare his agreement with Caesars void would, as in *Topaz*, allow him to "escape full responsibility for [his] misrepresentations and would penalize [Caesars], [which] loaned the full sum requested in good faith . . . ."[62] And estoppel is especially called for in this case because Michael was required under his contract and my summary-judgment order to sign the marker. It would defy the most fundamental notions of equity to allow him to declare his debt void and to avoid his financial obligation to Caesars simply because he is willing to risk being held in contempt of court by not signing the marker. I therefore find that Michael is equitably estopped from challenging the enforceability of his contract with Caesars, and I grant Caesars summary judgment on its estoppel claim.

### C. Caesars hasn't provided enough information to warrant summary judgment on its setoff and recoupment affirmative defenses.

Caesars acknowledges that it currently has more than $582,000 belonging to Michael on hold in an account.[63] Michael claims that this money comes from "prior transactions between the parties," and Caesars refers to the funds as "prior winnings" but adds no additional detail.[64] In answer to Michael's related breach-of-contract counterclaim, Caesars raises the equitable

---

[61] ECF No. 174 at 9.

[62] *Topaz Mut. Co.*, 839 P.2d at 611.

[63] ECF No. 169-2 at 4, ¶ 5(d).

[64] ECF No. 5 at 16; ECF No. 12 at 3.

remedies of setoff and recoupment as affirmative defenses,[65] which Caesars asserts allows it to apply the funds against the debt Michael owes it.[66]  It seeks summary judgment on these defenses, but without additional information, I am not inclined to allow Caesars to seize money that it acknowledges belongs to Michael.

Caesars has not, for instance, informed me when Michael won this money, why it was never withdrawn, what provision of Nevada law, if any, allowed Caesars to keep the funds on hold, whether gaming statutes or its own regulations require Caesars to pay interest on such accounts, and when Michael began asking for the funds to be paid out.  Nor has Caesars addressed Michael's allegation that it promised to pay him the funds for more than a year.[67] Without such critical details, I cannot conclude that an equitable remedy is appropriate.  So, I deny Caesars's partial-summary-judgment motion on its setoff and recoupment affirmative defenses but grant it leave to renew its motion with a more developed record within 30 days of this order.

* * *

In sum, I grant Caesars summary judgment on its breach-of-contract claim as to damages, as well as its equitable-estoppel claim, and I award Caesars damages in the amount of the $3 million loan Michael took out, plus the 18% contractual interest he agreed to pay under the credit application.[68]  Caesars requests that I enter final judgment on this sum, minus a setoff for the

---

[65] ECF No. 12 at 6 (answer to Michael's counterclaim).

[66] ECF No. 169–70.

[67] ECF No. 5 at 16.

[68] ECF No. 65 ("In the event of a collection action, I agree to pay prejudgment and post-judgment interest at a rate of 18% per annum plus all expenses and attorney's fees incurred by [Caesars].").

$582,000 it has on hold for Michael that it seeks to seize.[69]  But I cannot yet enter final judgment because I haven't decided the setoff issue or what amount of punitive damages, if any, are warranted.  And although Caesars has calculated the amount in contractual interest that Michael owes,[70] I will ask it to provide me an updated figure before entering final judgment.

## II.  Because all the elements of Caesars's fraud claim were deemed established by my sanctions order, I grant it summary judgment on the liability portion of this claim.

To succeed on a common-law claim for fraudulent misrepresentation in Nevada, a plaintiff must prove (1) "that the defendant made a false representation to him"; (2) "with knowledge or belief that the representation was false or without a sufficient basis for making the representation"; (3) "that the defendant intended to induce the plaintiff to act or refrain from acting on the representation"; (4) "that the plaintiff justifiably relied on the representation"; and (5) "that he was damaged as a result of his reliance."[71]  In my order adopting Judge Foley's report and recommendation and overruling Michael's objections, I deemed the following facts established:

1.  Michael did not have sufficient funds to pay or satisfy a $3 million credit obligation, and he knew he did not have sufficient funds to do so [on specific dates].

2.  Despite the knowledge that he did not have sufficient funds to satisfy a $3 million credit obligation, Michael induced Caesars to act by advancing him credit up to and including the sum of $3 million based upon his history of gambling with Caesars and the express provisions of the credit application.

3.  Michael expressly promised that "Before drawing on my line of credit, if granted, I agree to sign credit instruments (i.e., checks) in the amount of the draw" and "If I receive an advance before I

---

[69] ECF No. 169 at 4.

[70] *Id*. at 8 & n.10.

[71] *Blanchard v. Blanchard*, 839 P.2d 1320, 1322 (Nev. 1992).

execute a credit instrument, I will promptly sign a credit instrument in the amount of the advance."

4. Michael had no intention to sign a credit instrument or to repay the advance when he accepted the $3 million credit advance from Caesars in September 2014.

5. Nevertheless, and despite this lack of promissory intent, Michael induced Caesars to act by advancing credit in the sum of the $3 million to Michael.[72]

I also prohibited Michael from "from introducing evidence to refute these established facts."[73]

Despite the expansive scope of these findings, Michael contends that there is a dispute of material fact about whether Caesars justifiably relied on his "Credit Application to advance credit."[74] But this misconstrues the crux of Caesars's fraud claim and my findings. Caesars didn't extend Michael $3 million in credit simply because he requested it—anyone can request credit—but also "based upon his history of gambling with Caesars"[75] and "in reliance on his promise that he would sign a marker promptly [after being advanced money to play]."[76] Michael's assertion that Caesars's reliance was unjustified is mere supposition and not sufficient to raise a material dispute of fact. I therefore grant Caesars summary judgment on the liability portion of its fraud claim.

Accordingly, the only issue left under this claim is damages. Caesars has requested punitive damages but has only stated that, if I am "inclined to consider punitive damages, such

---

[72] ECF No. 174 at 8–9.

[73] *Id*. at 9.

[74] ECF No. 175 at 3 (supplemental opposition).

[75] ECF No. 174 at 9.

[76] ECF No. 63-2 at 3 (declaration of Caesars's Vice President of Table Games).

an award could be addressed separately as part of a punitive phase."[77]  Because I have found in

Caesars's favor on its fraud claim, I grant it leave to file a brief addressing whether it is entitled

to punitive damages and the calculation thereof, and whether punitive damages can be awarded

on summary judgment or will require a jury trial.

## III.    Caesars's remaining claims

In its pending summary-judgment motions, Caesars represented that, if I granted it

summary judgment on its fraud claim and the damages portion of its contract claim, it would

"withdraw its claims for (1) declaratory relief, (2) unjust enrichment, (3) account stated, and (4)

breach of the implied covenant of good faith and fair dealing."[78]  Because I have granted Caesars

the relief it sought, I direct it to move to dismiss its remaining claims.

## IV.    Because Michael refuses to comply with my order to sign the marker without seeking relief from that order, I hold him in civil contempt of court.

A "district court has wide latitude in determining whether there has been a contemptuous

defiance of its order."[79]  Once the moving party has demonstrated by clear and convincing

evidence that the alleged contemnor violated "a specific and definite order of the court," the

burden then shifts to the opposing party to demonstrate that he "took every reasonable step to

comply."[80]  The contempt "need not be willful, and there is no good faith exception to the

requirement of obedience to a court order."[81]  Civil contempt may be disciplined by fines,

---

[77] ECF No. 170 at 4.

[78] ECF No. 169 at 5 n.5.

[79] *Stone v. City & County of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992) (quoting *Gifford v. Heckler*, 741 F.2d 263, 266 (9th Cir. 1984) (internal quotation marks omitted)).

[80] *Id.* at 856 n.9.

[81] *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993).

imprisonment, or both.[82]  "A civil contemnor 'carries the keys of his prison in his own pocket' because civil contempt is 'intended to be remedial by coercing the defendant to do what he had refused to do.'"[83]

I find Michael in contempt of court for refusing to comply with my order to sign the marker.  Although Michael disagrees with the reasoning in the underlying summary-judgment decision that gave rise to that order, no party is entitled to simply ignore a court order.  Rather than see this case through to its conclusion and then seek review from the Ninth Circuit, Michael prematurely appealed—twice—without ever giving notice to the court of why it wasn't complying with an order.  Even after his appeals were denied, Michael only addressed the issue once Caesars moved for a show-cause order.[84]  And while signing the marker may, in theory, expose Michael to criminal prosecution, he never sought relief from the court or tried to enter into a stipulation or settlement with Caesars.  Instead, Michael sat on his hands—as he has done at every stage of this case.  The only remaining question is what penalty is appropriate.  I direct Caesars to submit a brief on that issue.

---

[82] 18 U.S.C. § 401.

[83] *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1110 (9th Cir. 2005) (quoting *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 441 (1911)).

[84] Although Michael argues that the issues raised in this case should be certified to the Nevada Supreme Court, ECF No. 164 at 4–9, he never addressed certification until his response to my show-cause order.  Indeed, Caesars brought this suit in state court, and Michael removed it to this court.  It is therefore disingenuous for him to seek certification after litigating this case past summary judgment and then prematurely appealing to the Ninth Circuit.  Regardless, his request for certification isn't a proper defense for not complying with my order to sign the marker or a reasonable explanation for why he failed to seek relief from this court.  Michael also failed to properly move for certification because he didn't seek that relief through an independent motion.  So, I decline to address the merits of that request.

## Conclusion

Accordingly, IT IS HEREBY ORDERED that:

- Caesars's partial motion for summary judgment related to (1) damages on its contract claim; (2) equitable estoppel; and (3) setoff/equitable recoupment **[ECF No. 169] is GRANTED in part and DENIED in part.** Caesars is granted summary judgment on the damages portion of its contract claim and equitable estoppel; it is entitled to an award of damages in the amount of $3 million, plus 18% contractual interest in a yet-to-be determined amount. I deny Caesars summary judgment on its setoff/recoupment affirmative defenses to Michael's counterclaims, **but I grant it leave to renew its partial summary judgment motion on this narrow issue by April 29, 2019, if it can cure the deficiencies addressed in my order.** The dispositive-motions deadline is reopened for the exclusive purpose of this limited summary-judgment motion. Michael may file a response and Caesars may reply within the standard summary-judgment timeline;

- Caesars's partial-summary-judgment motion on its fraud claim **[ECF No. 170] is GRANTED.** I grant Caesars leave to file a brief addressing whether it is entitled to punitive damages and the calculation thereof, and whether a jury trial is necessary. Caesars may consolidate this brief with its renewed partial summary-judgment motion. Similarly, Michael and Caesars may file a consolidated response and reply, respectively;

- I direct Caesars to move to withdraw its remaining claims, which it may also file with its summary-judgment motion. No response is needed;

- **I find Michael in contempt of court** for refusing to comply with my order to sign the marker. Caesars is directed to brief what penalty is appropriate, which it may consolidate with its renewed summary-judgment motion. Michael may file a response, and Caesars may reply.

Dated: March 28, 2019

_____

U.S. District Judge Jennifer A. Dorsey